**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
Honorable Howard R. Tallman**

In re:                                    )
                                          )
**RICHARD WILLIAM PALMER and**            )   Case No. 14-21837 HRT
**DAR MAE PALMER,**                       )
Debtors.                                  )   Chapter 7
                                          )
_____  )

## ORDER ON MOTION TO DISMISS

This case comes before the Court on the United States Trustee's Motion to Dismiss under 11 U.S.C. §§ 707(b)(1) and 707(b)(2) or, in the alternative, § 707(b)(3), filed on October 31, 2014 (docket #15) (the "Motion"), and Debtors' Response filed on November 26, 2014 (docket #19). The hearing in this matter, originally set for June 25, 2015, was rescheduled several times by agreement of the parties. On October 5, 2015, the Court held an evidentiary hearing on the Motion and Response and took the matter under advisement. The Court is now ready to rule.

I.  Background

Debtors filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code on August 27, 2014. On the first page of the petition, and on Form B22A, Debtors indicated their debts were primarily business debts. On Schedule F, Debtors listed a number of debts incurred for both personal and business purposes, including $91,312 in student loans.[1] The United States Trustee ("UST") timely filed a statement of presumed abuse on October 6, 2014, stating:

> As required by 11 U.S.C. Sec. 704(b)(1)(A), the United States Trustee has reviewed the materials filed by the debtors. Having considered these materials in reference to the criteria set forth in 11 U.S.C. Sec. 707(b)(2)(A), and, pursuant to 11 U.S.C. Sec. 704(b)(2), the United States Trustee has determined that: (1) the debtors' case should be presumed to be an abuse under section 707(b); and (2) the product of the debtors' current monthly income, multiplied by 12, is not less than the requirements specified in section 704(b)(2)(A) or (B).

The UST then moved to dismiss the case, arguing Debtors' debts were primarily consumer debts, citing § 707(b)(1),[2] which provides "the court ... may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the

---

[1] The indication "business" or "personal" was listed next to some of the debts, but no such indication appeared by the student loans.

[2] Unless otherwise indicated, all statutory references are to Title 11 of the United States Code.

debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter."  In their response, Debtors contended the student loan debts were not consumer debts, making the presumption of abuse inapplicable.

In the Motion and Response, the parties made other arguments as to whether the case should be dismissed under § 707(b)(3),[3] but, in a joint pre-trial statement filed on June 18, 2015 (docket #36), the parties agreed the only issue before the Court was whether the student loan debts were consumer debts, as defined by § 101(8), as "debt incurred by an individual primarily for a personal, family or household purpose."  If so, the parties agreed the granting of relief under chapter 7 would be an abuse of the provisions of chapter 7, and the Debtors would convert to a chapter 13 case within 14 days of the Court's order, failing which the case would be dismissed.

II.  Facts

Debtor Richard Palmer ("Debtor") attended Pomona College in Claremont California, graduating in 1988 with a Bachelor of Arts in philosophy, politics and economics.  After graduation, he worked as an Administrative Assistant at an insurance brokerage firm.  In 1990, he started classes at Pepperdine University in California, working towards a Masters in Business Administration, while continuing to work full-time at the brokerage firm.  In 1991 he was laid off from the brokerage firm and began working for Golden Coast Insurance Services, in the premium audit department.  He graduated from Pepperdine in 1993 with an MBA, emphasis in accounting.  He continued to work at Golden Coast Insurance Services until he was laid off in 1997.  Within a week he was re-employed by Essential Insurance Services ("Essential"), a seven-person office located in Loveland, Colorado.  Since that time, Debtor has remained employed by Essential, and currently he is the manager of quality control for the premium audit group.

Although Debtor took out student loans in order to pay for his education at Pomona and Pepperdine, he had paid off all but $10,000 owing on those loans by 2009.[4]  In 2009, Debtor began taking online courses with Argosy University towards a doctorate degree in business

---

[3]  That section provides for dismissal in cases where the presumption of abuse does not arise or is rebutted, when the Court finds the petition was filed in bad faith or the totality of the circumstances demonstrates abuse.

[4]  At the hearing, the Debtor conceded that since these loans were not used for a business venture, they were not business debts.

administration, while continuing his full-time employment at Essential.  Essential did not require him to obtain the doctorate and did not contribute towards the cost of the degree.  Debtor took out over $80,000 in student loans to pay for tuition at Argosy.  He completed his doctorate courses in October 2011, and then began working on his dissertation, which focused on the history of the Oregon wine industry.  According to Debtor's testimony at the hearing, the subject of his dissertation was prompted by a vacation trip to Oregon in 2009, where he and his wife visited a number of wineries.   In December 2011, Debtor and his wife purchased a bar, Blitz Sports Bar, which they operated as co-managers. Although he was a co-manager of the bar, Debtor remained employed full-time by Essential.   At the hearing, Debtor testified he and his wife always wanted to be business owners, but due to problems left from the former owners, the bar was not profitable and ultimately closed in 2014.  At that point, Debtor began to focus on acquiring Essential from its current owners, who are contemplating retirement.  At the hearing, Debtor testified the owners had approached him about buying Essential years ago, but no discussions had taken place regarding price, timing, or other terms.  Debtors' primary argument at the hearing was he took out the student loans for tuition at Argosy with the intention of becoming a business owner; thus, the debts were incurred with a profit motive, making them non-consumer debts.

III.  Discussion

Section 707(b)(1) provides, in relevant part:

After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, trustee (or bankruptcy administrator, if any), or any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter.

Section 707(b)(2) provides, in relevant part:

In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter, the court shall presume abuse exists if the debtor's current monthly income reduced by the amounts determined under clauses (ii), (iii), and (iv), and multiplied by 60 is not less than the lesser of--
(I) 25 percent of the debtor's nonpriority unsecured claims in the case, or $7,475, whichever is greater; or
(II) $12,475.

There are two prerequisites to dismissal under § 707(b)(1): 1) the debtor has primarily consumer debt; and 2) the bankruptcy court finds that granting the debtor's petition would be an abuse of chapter 7.  *Aspen Skiing Co. v. Cherrett (In re Cherrett)*,  523 B.R. 660, 668 (BAP 9th Cir. 2014) (citing *Price v. U.S. Trustee (In re Price)*, 353 F.3d 1135, 1138 (9th Cir.2004)).  The moving party bears the burden of proof to support a § 707(b)(1) motion by a preponderance of the evidence.  *Id.* (citing *In re Baker*, 400 B.R. 594, 597 (Bankr.N.D.Ohio 2009)).

In the Motion, the UST argues Debtors' debt is primarily consumer debt and granting the Debtors' petition would be an abuse of chapter 7.  If the UST proves these two elements by a preponderance of the evidence, this Court may dismiss or convert Debtors' case under § 707(b)(1).  The UST further argues abuse should be presumed under § 707(b)(2), because Debtors' annualized current monthly income is above the median for a family of two for the state of Colorado,[5] and based on the UST's calculations, Debtors' current monthly income reduced by allowed deductions and multiplied by 60 is greater than $12,475.[6]  Accordingly, the presumption of abuse under Section 707(b)(2) arises in this case, so long as Debtors' debts are "primarily consumer debts" as defined in § 101(8).

   A.  Are student loans consumer debt?

   The bankruptcy code defines a consumer debt as "debt incurred by an individual
   primarily for a personal, family, or household purpose."  The legislative history of
   this language indicates that it was adapted from the definition used in various
   consumer protection laws, and the courts have turned to the tests articulated in
   cases decided under those laws to determine when a debt falls within the above
   description.  Under this standard a credit transaction is not a consumer debt when
   it is incurred with a profit motive.

*Citizens Nat'l Bank v. Burns (In re Burns)*, 894 F.2d 361, 363 (10th Cir. 1990) (citations omitted) (discussing consumer debt in the context of § 523(d)).  For instance, courts have been guided by cases decided under the Truth in Lending Act.  *See In re Booth*, 858 F.2d 1051, 1054-

---

   [5]  *See* § 704(b)(2)(B).  Exhibit A to the Motion shows Debtors' annualized current monthly income as $122,899, compared to the applicable median annual family income in Colorado of $66,663.

   [6]  *See* § 707(b)(2)(A)(i). Exhibit A to the Motion also shows Debtors' monthly disposable income as $2,282, which, multiplied by 60, is $136,939.  Debtors' schedules I and J showed monthly disposable income of only $46.55.

55 (5th Cir. 1988) (collecting cases) (debt not a consumer debt if "incurred with an eye toward profit.").

This Court previously has held a student loan debt incurred in order to attend medical school was a consumer debt.  In *In re Grenardo* (No. 11-25401-HRT, Bankr. D. Colo. May 2, 2012), this Court stated:  "where student loans result in tangible benefits that are assimilated to the debtor's person, thereby enhancing the debtor's personal qualities, the Court concludes that the loans are properly characterized as consumer debts." *Grenardo*, Slip op. at 14.  In so holding, this Court relied on *In re Stewart*, 175 F.3d 796 (10th Cir. 1999), where the Tenth Circuit affirmed a bankruptcy court's decision holding student loan debts incurred by a debtor to attend medical school were consumer debts.  The bankruptcy court in the *Stewart* case reasoned as follows:

> No one forces a debtor to incur student loans; such debts are incurred on debtor's own initiative, at his option, in hopes of enhancing those most personal of qualities, the functioning of his own mind and his own hands, and thereby benefitting himself, his family and his household for the rest of his life. Such intangible benefits, acquired with creditors' money, are assimilated to the debtor's own person, and cannot be conserved as security for payment of the debt. But if the debtor's higher education gains him a higher salary, he can keep that benefit to himself, especially if he uses bankruptcy to cancel his creditors' right to use *in personam* debt collection methods. In effect, the student borrower gets "personal" benefits while avoiding "personal" payment.

*In re Stewart*, 201 B.R. 996, 1004 (Bankr. N.D. Okla. 1996) ("*Stewart I")*.

The United States Bankruptcy Appellate Panel of the Tenth Circuit ("BAP"), when affirming the bankruptcy court's decision in *Stewart I*, did note that "student loans are not consumer debts *per se*."  *In re Stewart*, 215 B.R. 456, 465 (BAP 10th Cir. 1997) ("*Stewart II")*. The court explained: "[t]here may be circumstances in which the debtor can demonstrate that the student loan was incurred purely or primarily as a business investment, albeit an investment in herself or himself, much like a loan incurred for a new business."  *Id.* The BAP recognized that generally a debt is not a consumer debt if it is "incurred with a profit motive," citing *Burns*, 894 F.2d at 363.  Thus, the BAP considered whether the debtor had incurred the debt with an eye towards profit or rather for humanitarian reasons (i.e., the altruistic goal of being a doctor).  The BAP ultimately held the student loan debt "was used in part for family living expenses and incurred in part for personal reasons. Although the record is not clear as to their primary use and purpose, there was no clear error in finding these loans were consumer debts."  *Id.* at 466.

The Tenth Circuit affirmed, agreeing with the BAP's interpretation of the *Burns* case regarding profit motive.  *See Stewart*, 175 F.3d at 806[7] (*"Stewart III"*).  Nevertheless, the Circuit did not need to reach the precise question of whether or not the student loans had been incurred with a profit motive, because the debtor had testified the money was predominately used for living expenses rather than his actual educational expenses.  Based on that testimony, the Circuit concluded a substantial portion of the student loan debt was consumer debt.

The *Stewart* cases are helpful as a starting point for the analysis in this case, but do not end the analysis.  In this case, the evidence was clear that all the student loan money borrowed by Debtor had been used directly to pay tuition and book expenses to Argosy University.  Thus, unlike in the *Stewart* cases, there is no issue about whether the student loan money was used for living expenses.  Debtors assert this distinction is pivotal, arguing they "incurred substantial student loan debt that was used for purposes of books and tuition, as opposed to living expenses, and by reasoning thereof such student loan debt is non-consumer in nature."  (Response, docket #19).

At the outset, the Court finds this distinction should not be pivotal. It may be a relevant factor, but it should not be fully determinative or the deciding factor.  Rather, the Court suggests that this distinction between living and tuition expenses may be problematic and may lead to disparate or unfair results.  For example, consider a college or graduate student who is able to live at home, supported by his or her parents, who uses student loan proceeds only for tuition and books.  Should that debt be treated differently than that of a student, who has earned scholarships to cover tuition and books, but is unable to live at home during the school year and so must use student loan proceeds for living expenses?  Focusing primarily on the amount spent for tuition and books as opposed to housing expense results in the live-at-home student incurring a business debt, while the scholarship student incurs a consumer debt.

Additionally, Debtors distinguished the *Stewart* cases at the hearing by arguing that unlike a medical degree, a degree in business administration clearly has a profit motive.  In support,  Debtors cite *In re De Cunae*, 2013 WL 6389205 (Bankr. S.D. Tex. 2013) where that court, in evaluating a student loan debt incurred to obtain a dental degree and open a dental practice, held "student loan proceeds that are used for direct educational expenses with the intent

---

[7] The Tenth Circuit agreed with the *Burns* decision but apparently misquoted it.  The language used by the Circuit identifies consumer debt as a debt incurred with a profit motive.

that the education received will enhance the borrower's ability to earn a future living are not consumer debts."   *Id.* at \*4.[8]

The UST, on the other hand, argued the profit-motive test may be relevant to the consideration of whether a debt is consumer or non-consumer, but "there are few human activities that are entirely innocent of profit motive," citing the bankruptcy court's decision in *Stewart I*, 201 B.R. at 996. The UST also cited *In re Millikan*, 2007 WL 6260855 (Bankr. S.D. Ind. 2007), in which the court held as follows:

> This Court finds that the "profit motive" test is unworkable in analyzing whether a particular student loan is a "consumer" debt. . . .  Even though the use of undergraduate and graduate education may lead to a financially comfortable lifestyle, such education is personal in nature; it resides only within the person who attends the classes and earns the degree. Education is a non transferrable asset that can only be used by the individual, unlike office equipment or leased office space or even a dental practice that can be purchased and transferred. . . . As the court in *Stewart I* observed, "[n]othing is more intimately personal that the debtor's own education—what goes, so to speak, between the debtor's own ears." 201 B.R. at 1005.

*Millikan*, 2007 WL 6260855, at \*5.

The *Millikan* court went on to note: "the difficulty with the profit motive test is that it places in the hands of the debtor the means to characterize the debt. If a debtor testified that he or she had attended school for humanitarian reasons or just for the personal satisfaction of learning, the student loan could be considered a consumer debt. If the debtor testified that he or she had attended school primarily to earn a large income, the same loan could now become a non consumer debt. The result of applying the 'profit motive test' allows a debtor to tailor his or her testimony to determine if a debt is to be considered a consumer or non consumer debt." *Id.* at \*6.

In contrast to *Millikan*, the court in *In re Rucker*, 454 B.R. 554 (Bankr. M.D. Ga. 2011), held it "cannot conclude that all student loan debts are incurred for the same purpose," and determined a trial was necessary whereby the court could consider "all facts relevant to purpose when the characterization of student loans is in dispute." *Id.* at 558.  This Court finds that

---

[8] In the Pre-Trial statement, Debtors also cite the case of *In re Belly*, which apparently is unpublished and not reported, as it was not available on Westlaw.  The Court was not provided with a copy of this opinion.

analysis problematic, however, as it would require courts to proceed into a quagmire of evidentiary and factual determinations every time a debtor asserted a student loan debt was non-consumer.  As the *Millikan* court reasoned:

> [W]ould money spent for tuition or books used for elective classes, say, art history, or archaeology still qualify as non consumer debt even though the debtor never intended to work as an archaeologist or an art historian? Had the debtor spent his first two years of college as a mathematics major, would the loans used for tuition and books associated with that period still be non consumer debt even though he never became a mathematician and switched his major to biology, earning no "profit" whatsoever from his mathematics education?

*Millikan*, 2007 WL6260855 at *5.

In the instant case, Debtor testified he incurred his student loans with Argosy in order to pursue his dream of being a "business owner."  Debtor did become a business owner midway through his pursuit of his doctorate degree, when he and his wife purchased a bar.  But the Court cannot conclude, as the *De Cunae* court did, that any time a debtor "sets out on a course of action to obtain a skill that would improve his ability to earn future income," he incurs a non-consumer debt.  This is a slippery slope that ultimately would lead to disparate results.  A student may incur debt in a certain area of study with the hope that he or she will eventually succeed in that area, but for various reasons this may or may not occur.

Further, where does the personal purpose for getting an education end and a profit motive begin?  Should the student loans of a compassionate doctor or teacher who obtains an education with altruistic motives, differ from those of someone determined to be an investment banker or business owner for pure profit motives, or even unabashed avarice?  Whether one pursues an education for an altruistic reason or with an eye towards profit, in either case, the student assimilates the benefits of the loan, rendering the value of the loan uncollectible by any creditor.  In *Grenardo*, this Court recognized that while student loans are not *per se* consumer debts, "in cases where student loans result in intangible benefits that are assimilated to the debtor's person, thereby enhancing the debtor's personal qualities," the loans are properly characterized as consumer debts.

At the hearing, the UST posited that if some nexus existed between a debtor's incurred debt and a tangible benefit to a business, there may be some basis to consider the debt to be non-consumer. For example, in *Cypher Chiropractic Ctr v. Runski (in re Runski),* 102 F.3d 744 (4th Cir. 1996), the Fourth Circuit held that office equipment a debtor purchased for a business purpose with a profit motive was not a consumer debt.  In the recent case of *In re Cherrett*,  523 B.R. at  669, the Ninth Circuit BAP examined the distinction between consumer and non-

consumer debt in the context of incurring housing debt for a business purpose.  That court stated: "the courts generally ascribe a business purpose, rather than a personal, family or household purpose to debts which are incurred 'with an eye toward profit' and which are 'motivated for *ongoing* business requirements.' ") (citations omitted) (emphasis added). These two cases involve tangible assets, rather than the intangible asset of an education.  Nevertheless, this Court believes the articulation of the standard in these cases adds a gloss not present in the Tenth Circuit's general reference to profit motive in *Stewart III*.

In determining a standard to use when dealing with an intangible asset such as a student loan, this Court finds that the following concepts are important:

1) The Tenth Circuit's reference to profit motive should be interpreted narrowly, in the context of whether student loans are consumer or non-consumer for the purposes of § 707(b).[9] This is in keeping with the intent of the changes made to the Code in 2005.  The so-called "means test" ushered in by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") is based on the fundamental notion that "those who have the means to repay their creditors in whole or in part should do so."  *In re Millikan*, 2007 WL 6260855 at *6.  The purpose of the means test is to "weed out chapter 7 debtors who are capable of funding a chapter 13 case." *In re Fredman*, 471 B.R. 540, 542 (Bankr. S.D. Ill. 2012). The means test and the provisions of § 707(b) apply only to an individual chapter 7 debtor "whose debts are primarily consumer debts." *In re Peterson*, 524 B.R. 808, 811 (Bankr. S.D. Ind. 2015).  The term "consumer" should be interpreted in the context of the Act in which it appears.[10]

2)  In *Stewart II*, the BAP noted there *may* be cases "in which the debtor can demonstrate that the student loan was incurred purely or primarily as a business investment, albeit an investment in herself or himself, much like a loan incurred for a new business." 215 B.R. at 465 (emphasis added).  "May" is a word of limitation and means not applicable to all situations. Trying to determine, on a case-by-case basis, which set of facts equates to a business investment, rather than a personal investment, will be problematic without a narrow, objective standard to apply.

---

[9]  The Tenth Circuit has analyzed profit motive using an objective standard in the context of an Internal Revenue Code section, 26 U.S.C. § 183 (activities not engaged in for profit), in *Cannon v. C.I.R.*, 949 F.2d 345, 351 n.8 (10th Cir. 1991) (noting a taxpayer's statement of intent is given less weight than objective factors in determining such intent).

[10]  For instance, the Truth in Lending Act was enacted to protect consumers, whereas BAPCPA, and particularly the means test, was enacted with an eye towards protecting creditors and preventing abuse by consumers.

3) If the profit motive is not interpreted narrowly, it can be applied to virtually all student loans.  It becomes an exception that swallows the rule.   This is aptly pointed out in the *Millikan* case, where the court expressed concern with allowing a debtor, in hindsight, to recast the motive for incurring the debt.  In many cases, education is initially undertaken for self-improvement purposes; the fact the education also may lead to increased earning potential is often a fortunate side benefit. This is why courts have struggled with applying the profit motive test to student loans: people go to school for many different reasons, and evaluating a given student loan debt according to the student's motivation can lead to disparate or unfair results.  A student loan incurred by an altruistic law student seeking to work for a non-profit should not, in equity, be viewed or treated differently than a loan incurred by a career-conscious law student seeking to work for a large, private law firm.

4) A narrow standard, tied to an existing business, or to some requirement[11] for advancement in a current job or organization, is necessary to avoid a student's aspirational goal, or a wished-for "hope and dream" being the focus, as opposed to the advancement of a tangible opportunity.  *See, e.g.*, *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 204 (1988) (analyzing "vague hopes or possibilities" in the context of plan confirmation, and holding the "promise of future services is intangible, inalienable, and, in all likelihood, unenforceable," having "no place in the asset column of the balance sheet.").[12]

All of these considerations lead the Court to conclude that, in order to show a student loan was incurred with a profit motive, the debtor must demonstrate a tangible benefit to an existing business, or show some requirement for advancement or greater compensation in a current job or organization.  The goal must be more than a hope or an aspiration that the education funded, in whole or in part, by student loans will necessarily lead to a better life through more income or profit.   More than hindsight representations are needed to meet this burden.  For instance, in this case, Debtor testified the courses he took in international business would lead to more beneficial international contacts for Essential.  However, the Court cannot conclude that Debtor incurred the Argosy debt with the objective of profiting Essential's

---

[11]  Some, but not all, employers pay the educational expenses of their employees who pursue education in furtherance of a business requirement.  There may be occasions, however, where student loans are incurred for business requirements and not fully reimbursed by an employer.

[12]  The Court draws guidance, by analogy, to the concept of a "hope and a prayer" in the context of plan confirmation where courts have been reluctant to accept a debtor's re-characterization of past events and projections of future performance in favor of a more objective, narrow standard.

business, when at the time he was merely an employee of Essential, and his business venture was to own a bar, unrelated to his current employment.  He testified Essential did not require or even suggest his pursuit of the education, which included a dissertation on the Oregon wine industry, not some aspect of the premium audit insurance industry.

In this case,  Debtor did not demonstrate that his student loan debt was incurred with a motivation to benefit an existing business or in furtherance of an ongoing job or business requirement.  Debtor did not own a business when he began his doctorate program, and there was no requirement by his employer to pursue the education.  Additionally, there was no evidence that Debtor's Argosy education contributed to a tangible benefit, either to the bar business he eventually owned or to Essential, which he would like to own at some time in the future.  Finally, Debtor's testimony indicated he pursued his doctorate, including his dissertation on the wine industry, at least partially for purposes of pleasure or recreation, in connection with a vacation to the Oregon coast.  As the Tenth Circuit noted in *Cannon v. C.I.R.*, 949 F.2d at 351, "[e]lements of personal pleasure or recreation" should be considered when determining whether an activity is pursued with a profit motive.  The Circuit further observed:

> Courts that fail to discern a profit motive often specify an alternative explanation for a party's actions. *See, e.g., Polakof*, 820 F.2d at 324 (limited partnership that bought film properties was motivated by a desire to create tax shelters rather than to profit); *Thomas*, 792 F.2d at 1258 (primary objective of coal mining program was to secure tax benefits rather than to earn an economic profit); *Estate of Power v. Commissioner*, 736 F.2d 826, 831 (1st Cir.1984) (taxpayer's horse-breeding activity was engaged in for personal satisfaction, not profit); *Eastman*, 635 F.2d at 841 (family engaged in horse-breeding in order to utilize the losses from that operation to offset other income).

*Id.* at 351 n. 9.

Given all of the foregoing, and after reviewing the entire record in this case, the Court concludes Debtor did not demonstrate the student loan was incurred purely or primarily for a profit motive.  From the testimony and evidence presented, the Court concludes that Debtor pursued his doctorate "for the personal purpose of fulfilling a lifelong goal . . . thereby benefitting himself, his family, and his household for the rest of his life."  *Stewart I*, 201 B.R. at 1004.  The student loan debt he incurred to pursue the doctorate is thus personal in nature and a consumer debt under § 101(8).

B.  Would the granting of relief under chapter 7 be an abuse of chapter 7?

In this case, the parties have stipulated that, if the Court finds the student loan debt to be a consumer debt, the granting of relief under chapter 7 would be an abuse of that chapter. Further, the UST has demonstrated the presumption of abuse arises under § 707(b)(2).  Thus the Court determines there are grounds to grant the UST's Motion.

The Court recognizes the practical effect of its holding: a debtor's debt burden could actually increase over the life of a chapter 13 plan, since, unless the plan will pay 100% to creditors, nondischargeable student loans will continue to accrue fees and interest during the three to five year span of the plan.  It may be better policy for a debtor with substantial student loans to obtain a discharge[13] in a shorter amount of time in chapter 7, thus theoretically freeing up income to pay the student loans after discharge of other debts.  However, the Court's duty is to apply the Bankruptcy Code provisions, taking into account the language as it has been interpreted in case law.

For all the foregoing reasons, the Court concludes there are grounds to grant the UST's Motion.  Accordingly, it is HEREBY ORDERED that within fourteen days of the date of this Order, Debtors shall convert their case to one under chapter 13, failing which this case shall be dismissed.

Dated this 16th day of December, 2015.

**BY THE COURT:**

Howard R. Tallman,  Judge
United States Bankruptcy Court

---

[13] The discharge would apply only to dischargeable debts.  The student loan debt would still be nondischargeable, absent a finding of undue hardship.  *See, e.g., Owens v. Dept. of Educ. (In re Owens)*, 525 B.R. 719, 721 (Bankr. C.D. Ill. 2015)(citing *Brunner v. New York State Higher Educ. Svcs. Corp.*, 831 F.2d 395, 396 (2nd Cir.1987)).